**No. 25-1032**

IN THE

# United States Court of Appeals

FOR THE FOURTH CIRCUIT

DISABILITY RIGHTS SOUTH CAROLINA, JUSTICE 360, SOUTH CAROLINA STATE CONFERENCE OF NAACP

*Plaintiffs-Appellants*,

v.

SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE, EDEN HENDRICK, in her official capacity as executive director of the South Carolina Department of Juvenile Justice,

*Defendants-Appellees*.

On Appeal from the United States District Court
District of South Carolina (Rock Hill)
No. 0:22-cv-01338-JDA-PJG
Hon. Jacquelyn D. Austin

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

Allen Chaney
ACLU of South Carolina
P.O. Box 1668
Columbia, SC 29202
(864) 372-6681
achaney@aclusc.org

Jacob D. Alderdice
Jeremy Creelan
Todd Costa
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036

Rita Bolt Barker
WYCHE, PA
200 E. Broad Street
Suite 400
Greenville, SC 29601
rbarker@wyche.com

*Additional Counsel on Following Page*

Janette Louard
Anthony Ashton
Quiana-Joy Ochiagha
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215
qochiagha@naacpnet.org

jalderdice@jenner.com
jcreelan@jenner.com
tcosta@jenner.com

William R. Weaver
Mary E. Marshall
JENNER & BLOCK LLP
1099 New York Ave.
NW Suite 900
Washington DC 20001
wweaver@jenner.com
mmarshall@jenner.com

Amit Patel
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
apatel@jenner.com

***Counsel for Plaintiffs-Appellants***

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and the Local Rules of the Fourth Circuit Rule 26.1, Plaintiffs-Appellants collectively state that they are not a publicly held corporation, other publicly held entity, or trade association; that they do not issue shares to the public and have no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States or abroad; that no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation; and that the case does not arise out of a bankruptcy proceeding.

# TABLE OF CONTENTS


INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 4

STATEMENT OF ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

A. Endemic Violence Across DJJ Facilities ........ 6

B. Overuse and Misuse of Isolation ........ 8

C. Unsanitary Conditions and Lack of Rehabilitative Services ........ 9

D. Harms to Plaintiffs ........ 10

1. Associational Harms to DRSC ........ 10

2. Organizational Harms ........ 11

E. Procedural History ........ 12

1. The First Two Rounds of Dismissal Briefing ........ 13

2. The Third Round of Dismissal Briefing ........ 15

STANDARD OF REVIEW ........ 19

SUMMARY OF ARGUMENT ........ 19

ARGUMENT ........ 25

I. DRSC's associational claims are not moot. ........ 25

A. DRSC's associational claims are not moot because many of its harmed constituents remain in custody. ........ 26

B. Alternatively, DRSC's claims fit an exception to mootness. ..... 33

II. Plaintiff organizations have prudential standing to bring claims under Section 1983. ..... 38

A. Plaintiffs' organizational claims assert constitutional violations and need not satisfy a zone-of-interests test... 40

B. Plaintiffs' organizational claims are consistent with the text, purpose, and precedent surrounding 42 U.S.C. § 1983. ..... 43

C. Plaintiffs' organizational claims are authorized by 42 U.S.C. § 1988. ..... 50

III. Plaintiffs' organizational claims for relief are viable under the ADA, Rehabilitation Act, and IDEA. ..... 51

A. Plaintiffs established Article III injuries arising from Defendants' statutory violations. ..... 53

B. The magistrate judge did not recommend (and Plaintiffs did not waive objections to) the dismissal of Plaintiffs' statutory claims alleging organizational harms. ..... 55

C. The district court clearly erred. ..... 57

CONCLUSION ..... 58

# TABLE OF AUTHORITIES

## CASES

*A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356 (4th Cir. 2008) ........ 58

*Abraugh v. Altimus*, 26 F.4th 298 (5th Cir. 2022) ........ 24, 50

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015) ........ 31

*Albright v. Oliver*, 510 U.S. 566 (1995) ........ 22, 40

*Alexander S. ex rel. Bowers v. Boyd*, 876 F. Supp. 773 (D.S.C. 1995) ........ 6

*Allee v. Medrano*, 416 U.S. 802 (1974) ........ 23

*Allen v. Wright*, 468 U.S. 737 (1984) ........ 43

*Bank of America Corp. v. City of Miami*, 581 U.S. 189 (2017) ........ 45

*Battle v. Ledford*, 912 F.3d 708 (4th Cir. 2019) ........ 47

*Board of Mississippi Levee Commissioners v. U.S. E.P.A.*, 674 F.3d 409 (5th Cir. 2012) ........ 53

*Bell v. Wolfish*, 441 U.S. 520 (1979) ........ 8

*Blondell v. Bouton*, No. 17-cv-372, 2019 WL 12338323 (E.D.N.Y. Mar. 29, 2019) ........ 36

*Blue v. Craig*, 505 F.2d 830 (4th Cir. 1974) ........ 44

*Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318 (1977) ........ 41

*Brown v. Town of Cary*, 706 F.3d 294 (4th Cir. 2013) ........ 50

*Camreta v. Greene*, 563 U.S. 692 (2011) ........ 37

*Center for Biological Diversity v. Trump*, 453 F. Supp. 3d 11 (D.D.C. 2020) .......... 41

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017) .......... 48

*Clarke v. Securities Industry Ass'n*, 479 U.S. 388 (1987) .......... 43

*Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019) .......... 48

*Cook v. Colgate University*, 992 F.2d 17 (2d Cir. 1993) .......... 36

*Covey v. Assessor of Ohio County*, 777 F.3d 186 (4th Cir. 2015) .......... 19

*Craig v. Boren*, 429 U.S. 190 (1976) .......... 47

*Damico v. California*, 389 U.S. 416 (1967) .......... 47

*Del Webb Communities, Inc. v. Carlson*, 817 F.3d 867 (4th Cir. 2016) .......... 25, 52

*Democratic Party of Virginia v. Brink*, 599 F. Supp. 3d 346 (E.D. Va. 2022) .......... 31

*Dennis v. Higgins*, 498 U.S. 439 (1991) .......... 46

*Disability Rights Pennsylvania v. Pennsylvania Department of Human Services*, No. 1:19-cv-737, 2020 WL 1491186 (M.D. Pa. Mar. 27, 2020) .......... 25, 51-52

*Doe 4 ex rel. Lopez v. Shenandoah Valley Juvenile Center Commission*, 985 F.3d 327 (4th Cir. 2021) .......... 9

*Doe v. Virginia Department of State Police*, 713 F.3d 745 (4th Cir. 2013) .......... 38

*Doherty v. Bice*, 101 F.4th 169 (2d Cir. 2024), *cert. denied,* 145 S. Ct. 381 (2024) .......... 36

*Dunn v. Dunn*, 219 F. Supp. 3d 1163 (M.D. Ala. 2016) .......... 32

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) .......... 40

*Elijah v. Dunbar*, 66 F.4th 454 (4th Cir. 2023) .......... 56, 57

*Ellis v. Railway Clerks*, 466 U.S. 435 (1984) .......... 26

*Energy Research Foundation v. Waddell*, 367 S.E.2d 419 (S.C. 1988) .......... 51

*Family & Children's Center, Inc. v. School City of Mishawaka*, 13 F.3d 1052 (7th Cir. 1994) .......... 4, 25, 52, 58

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) .......... 37-38

*Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) .......... 32

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266 (11th Cir. 2021) .......... 47, 49

*Franks v. Bowman Transportation Co.*, 424 U.S. 747 (1976) .......... 37

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000) .......... 26

*G.H. ex rel. Henry v. Marstiller*, 424 F. Supp. 2d 1109 (N.D. Fla. 2019) .......... 54

*In re Gault*, 387 U.S. 1 (1967) .......... 42

*Gerstein v. Pugh*, 420 U.S. 103 (1975) .......... 34, 35

*Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989) .......... 23, 46

*Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166 (2023) .......... 23, 47

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) .......... 15-16

*International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock*, 477 U.S. 274 (1986) .......... 38

*Jackson v. Sargent*, 394 F. Supp. 162 (D. Mass.), *aff'd*, 526 F.2d 64 (1st Cir. 1975) .......... 41

*June Medical Services L. L. C. v. Russo*, 591 U.S. 299 (2020), *abrogated by Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) .......... 47-48

*Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298 (2012) .......... 20, 26

*Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) .......... 21, 22, 39, 40, 46

*Martin v. Duffy*, 858 F.3d 239 (4th Cir. 2017) .......... 57

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) .......... 40

*McAlindin v. County of San* Diego, 192 F.3d 1226 (9th Cir. 1999) .......... 53

*McCullum v. Orlando Regional Healthcare System, Inc.*, 768 F.3d 1135 (11th Cir. 2014) .......... 58

*Memphis A. Philip Randolph Institute v. Hargett*, 2 F.4th 548 (6th Cir. 2021) .......... 35-36

*Milwaukee Police Ass'n v. Board of Fire & Police Commissioners of City of Milwaukee*, 708 F.3d 921 (7th Cir. 2013) .......... 30

*MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288 (2023) .......... 28

*Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978) .......... 22-23, 47

*Monroe v. Pape*, 365 U.S. 167 (1961), *overruled on other grounds by Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978) ..... 51

*Moor v. Alameda County*, 411 U.S. 693 (1973) ..... 23, 24, 50

*Munsell v. Department of Agriculture*, 509 F.3d 572 (D.C. Cir. 2007) ..... 30

*NAPCO, Inc. v. Landmark Technology A, LLC*, 555 F. Supp. 3d 189 (M.D.N.C. 2021) ..... 42

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ..... 23, 48

*North Carolina State Conference of NAACP v. North Carolina State Board of Elections*, 283 F. Supp. 3d 393 (M.D.N.C. 2017) ..... 49

*Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016) ..... 23, 48

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003) ..... 2, 29

*Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925) ..... 23

*Planned Parenthood South Atlantic v. Wilson*, 26 F.4th 600 (4th Cir. 2022), *vacated on other grounds*, No. 21-1369, 2022 WL 2900658 (4th Cir. July 21, 2022) ..... 3, 21, 44, 49

*Protection & Advocacy for People with Disabilities, Inc. v. South Carolina Department of Disabilities & Special Needs*, 783 S.E.2d 835 (S.C. Ct. App. 2016) ..... 51

*Republican Party of North Carolina v. Martin*, 980 F.2d 943 (4th Cir. 1992) ..... 19

*Robertson v. Wegmann*, 436 U.S. 584 (1978) ..... 46

*Selevan v. New York Thruway Authority*, 584 F.3d 82 (2d Cir. 2009) ..... 41

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019), *stayed by* 140 S. Ct. 1 (2019) (per curiam). .................................................. 22, 41

*South Carolina State Conference of NAACP v. Alexander*, No. 3:21-cv-3302, 2022 WL 453533 (D.S.C. Feb. 14, 2022)........................ 32

*Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013) .................. 39

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009)................... 30-31

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504 (2019) ............................................................................................. 41

*T.H. ex rel. T.B. v. DeKalb County School District*, 564 F. Supp. 3d 1349 (N.D. Ga. 2021) .......................................................... 54

*Thompson v. North America Stainless, LP*, 562 U.S. 170 (2011) ...................................................................................... 40, 45

*Trachtman v. Anker*, 563 F.2d 512 (2d Cir. 1977).................................. 36

*United States v. Jones*, 60 F.4th 230 (4th Cir. 2023), *summarily vacated*, 144 S. Ct. 1091 (2024) ........................................ 49

*United States v. Springer*, 715 F.3d 535 (4th Cir. 2013) ...... 26, 33, 34, 35

*Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023) .......................... 21, 47

*Voto Latino v. Hirsch*, 712 F. Supp. 3d 637 (M.D.N.C. 2024)........... 31, 49

*Will v. Michigan Department of State Police*, 491 U.S. 58 (1989) ........................................................................................... 46

*Wood v. Milyard*, 566 U.S. 463 (2012) .................................................. 53

**STATUTES**

20 U.S.C. § 1412(a)(3)............................................................................ 54

42 U.S.C. § 1983.............................................................................. 44, 45

42 U.S.C. § 10801 *et seq*. ........................................................................ 42

S.C. Code § 43-33-310 *et seq.* ........................................................ 1, 42

S.C. Code § 63-19-1440(C) ........................................................ 34

**OTHER AUTHORITIES**

Appellants' Brief, *Planned Parenthood South Atlantic v. Wilson*, No. 21-1369 (4th Cir. July 7, 2021), Dkt. 32 ........................ 44

Maayan Schechter, *16-year-old Teen Dies After Suicide Attempt at SC's Detention Facility for Juveniles*, S.C.P.R. (Dec. 7, 2023), https://www.southcarolinapublicradio.org/sc-news/2023-12-07/djj-death ........................................ 9

# INTRODUCTION

Three years after Plaintiffs filed this case, a central fact remains undisputed: children held in the custody of the South Carolina Department of Juvenile Justice ("DJJ") are held in torturous conditions. DJJ's secure facilities are severely overcrowded and understaffed. The children held in those facilities face historic levels of extreme violence, frequent prolonged solitary confinement, squalid living conditions, and are provided with virtually no rehabilitative or educational services. Those unlawful conditions harm Plaintiffs as organizations and, in the case of Plaintiff Disability Rights South Carolina[1] ("DRSC"), harm its statutory constituents: children in DJJ custody with disabilities.

So far, Plaintiffs' repeated pleas for emergency relief have been stifled by Defendants' shifting and regenerating procedural arguments. After three years and three rounds of preliminary injunction and dismissal briefing, the district court has yet to reach the merits of Plaintiffs' claims. In asking this Court for reversal, Plaintiffs seek to finally move this case past the pleading stage for the adjudication on the merits that their claims deserve.

[1] Plaintiff DRSC is South Carolina's designated Protection and Advocacy System and Client Assistance Program ("P&A"), as defined by the federal Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801 *et seq*. *See* S.C. Code § 43-33-310 *et seq*.

The district court's decision to dismiss the case contains three reversable errors.

**First**, the district court erroneously concluded (without briefing from either party) that Plaintiff DRSC's associational claims are moot. Plaintiffs allege pervasive, system-wide constitutional and statutory violations. Because DRSC, as the state P&A, will always represent constituents in those facilities, it is self-evident that DRSC, through its constituents, will maintain concrete adverseness with Defendants until those conditions improve. Thus, its associational claims are not moot. *See, e.g.*, *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1116-18 (9th Cir. 2003) (holding that the release of constituents identified in the complaint does not moot P&A's associational claims).

In the First Amended Complaint ("FAC"), DRSC helped illustrate its associational claims by identifying nine specific constituents and describing their common injuries. But contrary to the district court's order, DRSC's standing does not rely on those children alone, and their release from custody does not moot DRSC's associational claims. If affirmed, the district court's novel rule would fatally undermine the P&A system and make it functionally impossible for DRSC to litigate the inherently transitory claims of its incarcerated, child-constituents.

**Second**, the district court wrongly dismissed Plaintiffs' organizational claims brought under 42 U.S.C. § 1983 for "fail[ing] to allege how their *own* Fourteenth Amendment rights have been

violated." JA402. But as this Court has already held, Section 1983 imposes no such requirement. *Planned Parenthood S. Atl. v. Wilson*, 26 F.4th 600, 608 & n.1 (4th Cir. 2022) (rejecting the same textual argument, as applied to associational standing, as "meritless"), *vacated on other grounds*, No. 21-1369, 2022 WL 2900658 (4th Cir. July 21, 2022). The Supreme Court has long allowed organizational, representational, and third-party claims to be brought under Section 1983, and this case is no different. The district court's theory would write these cases out of existence. Plaintiffs' organizational claims seek to vindicate organizational harms that flow directly from Defendants' violations of the Fourteenth Amendment, and that is precisely what Section 1983 allows.

**Third**, the district court gave short shrift to Plaintiffs' statutory claims brought under the Americans with Disabilities Act ("ADA"), Rehabilitation Act ("RA"), and Individuals with Disabilities Education Act ("IDEA"), dismissing them all in a footnote. Plaintiffs' FAC details Defendants' systemic violations of the ADA, RA, and IDEA through the disparate treatment, disparate impact, and denial of necessary services and special education to disabled children. Rather than engaging with those claims, the district court held that Plaintiffs waived any objections to the magistrate judge's recommendation to dismiss them on prudential standing grounds. But Defendants did not seek dismissal—and the magistrate judge did not recommend dismissal—on those

grounds. Even if it had, such a dismissal would be clearly erroneous—it is black letter law that organizations may vindicate harms inflicted by violations of these statutes. *See, e.g.*, *Fam. & Children's Ctr., Inc. v. Sch. City of Mishawaka*, 13 F.3d 1052, 1061 (7th Cir. 1994) ("Congress has implicitly granted standing under the IDEA to the limits of Article III.").

Plaintiffs respectfully request that this Court promptly reverse the district court's decision, and order that Defendants' motion to dismiss be denied in full.

## JURISDICTIONAL STATEMENT

Plaintiffs filed this action under 42 U.S.C. § 1983, 20 U.S.C. § 1400 *et seq*., 42 U.S.C. § 12101 *et seq*. and 29 U.S.C. § 705 *et seq*., and the district court properly exercised jurisdiction under 28 U.S.C. § 1331. Plaintiffs filed a timely notice of appeal on January 8, 2025. JA406-407. The Court therefore has jurisdiction to review the district court's order dismissing the case under 28 U.S.C. § 1291 and to review the district court's order denying a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

**I.** DRSC, as the state's P&A, seeks relief for its constituents—that is, for all children "with mental illness" held in DJJ custody. Do DRSC's associational claims become moot if Defendants release the

specific children identified in the FAC, or does it maintain "concrete adverseness" through its many other harmed constituents?

**II.** Defendants' constitutional violations are causing Plaintiffs to suffer diversion of resources and frustration of purpose. Can Plaintiffs seek injunctive relief from those injuries under 42 U.S.C. § 1983?

**III.** Defendants' violations of the ADA, RA, and IDEA are causing Plaintiffs to suffer diversion of resources and frustration of purpose. Do those statutes authorize relief from organizational injuries?

## STATEMENT OF THE CASE

On April 26, 2022, Plaintiffs-Appellants initiated this action against Defendants South Carolina Department of Juvenile Justice ("DJJ") and Eden Hendrick, in her official capacity as Executive Director of DJJ. Plaintiffs allege several constitutional and statutory claims and seek injunctive relief from the deplorable conditions juveniles face in the five secure facilities operated by DJJ. Defendants must provide children with safe custodial care and rehabilitation, but they instead subject them to extreme violence, prolonged periods of isolation, unsanitary conditions, and offer little to no educational or rehabilitative services. Plaintiffs are three non-profit organizations that either serve children in DJJ custody and/or represent them as members. Each Plaintiff has suffered diversion of resources and

frustration of purpose due to Defendants' unlawful treatment of children at DJJ. Plaintiff DRSC, as the South Carolina P&A, also alleges associational harms on behalf of its statutory constituents—children with disabilities detained in DJJ facilities.

### A. Endemic Violence Across DJJ Facilities

The Fourteenth Amendment guarantees detained youth "a right to reasonable protection from the aggression of other juveniles and staff." *Alexander S. ex rel. Bowers v. Boyd*, 876 F. Supp. 773, 797 (D.S.C. 1995).

Yet, as measured by DJJ's own statistics, children in DJJ facilities are subject to historically horrific levels of violence. DJJ reports over one hundred assaults, fights, and injuries each month, with levels only increasing in recent years. JA090-091. DJJ's practices drive these levels of violence, including by failing to train its employees to prevent the violence, failing to maintain cameras or fix locks, woefully understaffing its facilities, and in some cases, employees directly or tacitly encouraging or participating in the violence themselves. JA094-096. DJJ facilities are dangerously understaffed and overcrowded. At last count, DJJ had 174 security vacancies across only five facilities. JA115. The lack of staff is further exacerbated by staggering overcrowding, particularly at JDC, the pretrial detention facility. JA115 (JDC is

designed to hold 72 children, but often "holds close to double that number").

As a result, Plaintiffs' clients and constituents have suffered brutal assault after brutal assault, such as a fourteen-year-old child with a serious mental illness who cycled through three facilities, and was attacked at each facility, including being beaten with a "'lock in a sock,' forcing him to get staples in his head to seal a wound." JA087. Another child was the victim of over 60 assaults while in DJJ custody, including being beaten with a sock filled with rocks while sleeping and then, when moved to isolation for protection, was stabbed repeatedly after the doors malfunctioned. JA086-087. Another child was "assaulted by DJJ staff five times while in DJJ" facilities, including being punched in the ribs so hard that he struggled to breathe afterwards. JA129. These are but illustrative examples; *all* children in DJJ custody are subject to the constant threat of violence. JA092, JA116, JA124. This pervading culture of fear is particularly harmful for DRSC's constituents—*i.e.*, children with disabilities, including mental illness—as they are more likely to be assaulted and victimized, and are particularly sensitive to being in perpetual states of hyper vigilance. JA130-131.[2]

---

[2] As one specific example of this, some children in DJJ custody avoid taking medications that they need to sleep because they fear they will be attacked while sleeping. JA089-090.

B. Overuse and Misuse of Isolation

Lacking any effective method of control of the children in their custody, DJJ uses prolonged periods of isolation to keep children "safe." JA097-102. This merely trades one Fourteenth Amendment violation for another. *See Bell v. Wolfish*, 441 U.S. 520 (1979).

DJJ uses isolation frequently and for prolonged durations. In February 2023, for example, DJJ recorded over 500 "separate instances of isolation." JA116. Isolation is used to keep children from being assaulted, to punish misbehavior, and sometimes for no apparent reason at all. JA116-117. Isolation is even used as a replacement for treating children's mental disabilities, JA100-101, and to restrain children who are experiencing distress, depression, and suicidal ideation, JA101. Children isolated in DJJ facilities typically spend 23 hours per day alone in a tiny cell, where they must sleep, eat, defecate, and urinate. JA097. Children may stay in these conditions for weeks or even months. JA097, JA099-100. Beyond that, DJJ isolation facilities are shockingly unsanitary— children have been placed in cells covered in blood (from a previous child who self-harmed), covered with feces, and without water access. JA097 ¶ 120.

Isolation is especially harmful for the children with disabilities represented by DRSC. JA116-117. DJJ does not have a mental health professional assess individuals before they are placed in isolation, and thus routinely isolates children with mental illness and a heightened

risk of suicide. JA100-101. Dozens of children, including Plaintiffs' clients and constituents, have attempted suicide while in DJJ custody. JA101, JA122. Tragically, one child in DJJ custody passed away in December 2023 due to a suicide attempt.[3]

Overuse of isolation, like violence, is a function of both conscious mismanagement and a result of facilities being woefully overcrowded and understaffed. Like violence, isolation is so common at DJJ that it harms *all children* held there. JA117.

### C. Unsanitary Conditions and Lack of Rehabilitative Services

The Fourteenth Amendment, the ADA, RA, and IDEA, require DJJ to provide a minimum level of rehabilitative, recreational, and educational services to children in its custody. DJJ fails systemically to provide any of these necessary services. JA102-108; *see Doe 4 ex rel. Lopez v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327, 342 (4th Cir. 2021).

DJJ does not provide meaningful educational services to children in its custody. Rather than live instruction, DJJ hands out worksheets. JA103. Those worksheets are sporadically provided, rarely collected, and almost never include feedback or guidance. JA103. Children are

---

[3] Maayan Schechter, *16-year-old Teen Dies After Suicide Attempt at SC's Detention Facility for Juveniles*, S.C.P.R. (Dec. 7, 2023), https://www.southcarolinapublicradio.org/sc-news/2023-12-07/djj-death.

sometimes even denied pencils to complete the assignment. JA103. DJJ provides no special education services to youth with disabilities, nor does DJJ identify children with disabilities who need specialized education and services. JA104. DJJ also lacks other necessary rehabilitative services, including any recreational programming and mental health treatment. JA105-108.

Finally, conditions at DJJ are unlivable. JA108-112. Rooms are overrun with odor, trash, mold, and bugs; in some facilities, maggots and cockroaches come up through the drains; and children are routinely housed in rooms with standing water. JA108-109. Children are often denied showers and other basic hygiene, JA110-111, and served food containing bugs or that is otherwise spoiled, JA111.

D. Harms to Plaintiffs

Defendants' failure to provide lawful conditions of confinement has caused significant organizational and associational harm to Plaintiffs.

### 1. Associational Harms to DRSC

As South Carolina's P&A, DRSC is "responsible for pursuing administrative, legal, and other appropriate remedies on behalf of all individuals with mental illness who are receiving care or treatment in the State." JA125. Under federal law, this includes "any individual diagnosed with a significant mental illness or emotional impairment

who is an inpatient or resident in a facility rendering care or treatment, including individuals involuntarily confined in a detention facility, jail, or prison." JA126 (citing 42 U.S.C. § 10802; 42 C.F.R. § 51.2).

According to DJJ, "the majority" of children in DJJ custody "meet criteria for at least one mental health disorder." JA130. At any given time, DRSC "is formally advocating on behalf of dozens of children [in] DJJ's secure facilities." JA127. These children are all child-constituents of DRSC and are all chronically subjected to violence, unlawful isolation, denial of rehabilitative services, and inhumane living conditions. JA130 ("Many of the problems observed by DRSC monitors are not unique to specific children and are instead shared amongst all of DRSC's child-constituents at DJJ."). In its FAC, DRSC identifies nine DRSC constituents (as "Child 5" through "Child 13") to illustrate specific examples of the above-described conditions, and the harms that consistently befall DRSC's constituents. JA127-129. Although these examples are harrowing, they represent "only a few of DRSC's constituents in DJJ custody." JA129.

**2. Organizational Harms**

All three Plaintiffs also suffer direct, organizational harms from DJJ's misconduct. Justice 360's mission is to provide direct legal representation to children in DJJ custody in their criminal cases. This mission is routinely frustrated due to the physical, psychological, and

emotional trauma experienced by Justice 360's clients in DJJ custody. For example, instead of spending time during client meetings working on their clients' cases, Justice 360 attorneys must spend a significant amount of additional time working through the effects of their clients' trauma caused by DJJ conditions. JA119, JA121-122. Justice 360 has also had to divert resources to hold trainings on how to address these traumas. JA123-124; *see also* JA126-127, JA132 (describing similar organizational harms to Plaintiffs DRSC and NAACP).

### E. Procedural History

Plaintiffs filed this action on April 26, 2022. JA001. The complaint alleged four counts of violations of the Fourteenth Amendment under Section 1983 against Defendant Eden Hendrick, in her official capacity as Director of DJJ, based on: (1) the failure to protect children entrusted to DJJ's care, (2) prolonged and punitive use of solitary confinement, (3) the failure to provide rehabilitative services, and (4) substandard conditions of confinement. Plaintiffs also alleged three statutory violations against Defendant DJJ, for (5) the violation of the ADA, (6) the violation of the Rehabilitation Act, and (7) the violation of IDEA. *Id.* ¶¶ 179-227. Plaintiffs sought declaratory and injunctive relief to remedy their alleged harms, and promptly moved for a preliminary injunction to seek some of the most pressing relief. Dkt. 13.

### 1. The First Two Rounds of Dismissal Briefing

After Plaintiffs' filing of the original Complaint and motion for preliminary injunction, Defendants moved to dismiss Plaintiffs' claims, raising a litany of procedural arguments. Dkt. 10. Under a local civil rule, all motions were referred to a magistrate judge who, on August 31, 2022, recommended the dismissal of Plaintiffs' entire complaint for lack of Article III standing. JA006-026. The magistrate judge did not reach Defendants' other arguments for dismissal.

Plaintiffs timely objected to the Report and Recommendation, Dkt. 49, and on February 2, 2023, the district court sustained those objections and denied Defendants' motion to dismiss. JA035. Specifically, the district court held that Justice 360 plausibly alleged that Defendants' conduct and omissions caused it to divert resources from its core mission, and those injuries "are likely redressable by a court decision mandating improved conditions at SCDJJ." JA032-034. Having ruled that at least one Plaintiff had standing, the district court referred the case back to the magistrate judge to rule on Defendants' other dismissal arguments, and Plaintiffs' motion for preliminary injunction. JA035.

Following a conference with the magistrate judge, Dkt. 73, the parties were directed to re-file their respective motions. Dkts. 81, 82.[4] On April 28, 2023, the magistrate judge issued a second report and recommendation ("2nd R&R"), again concluding that Plaintiffs' complaint should be dismissed in full. JA060-061. Among other bases, the magistrate judge concluded that although Justice 360 had established organizational standing, it did not sufficiently allege that harm in the Complaint. JA046-049. The magistrate judge also reasoned that Plaintiffs' organizational injuries, while cognizable under the ADA, RA, and IDEA, were not within the zone-of-interests protected by 42 U.S.C. § 1983. JA049-053. Thus, the magistrate judge recommended dismissal pursuant to Rule 12(b)(6). JA060-061.

Plaintiffs again objected, but on September 14, 2023, the district court adopted the Report and Recommendation in part and rejected it in part. JA067-068. The district court noted that much of Plaintiffs' prior support for their organizational harm (in the first round) was presented through declarations and other documents, and agreed with the

[4] At this stage, the magistrate judge also permitted Plaintiffs to conduct some document discovery as relevant for their (2nd) motion for preliminary injunction. Discovery showed that DJJ facilities were so dangerous that staff stopped showing up for work out of fear for their own safety, that when violence erupts DJJ officers "stand[] back and do[] not ... try[] to mitigate or de-escalate the incident," and that facilities were so overcrowded that dozens of children were sleeping in plastic "boat beds" in DJJ hallways and common areas. *See* Dkt. 97 at 2-6.

magistrate judge that the allegations of harm in the complaint itself were "conclusory." JA064-065. The court accepted that ground for dismissal only and did not address the others. JA065.

Fourteen days later, on September 28, 2023, Plaintiffs filed their operative First Amended Complaint ("FAC"), adding, among other things, extensive additional support for the organizational and associational harms DJJ children are suffering. JA069-148. Defendants filed their third motion to dismiss, re-asserting their same arguments for dismissal, JA149-179, and Plaintiffs renewed their motion for preliminary injunction, Dkt. 123.

#### 2. The Third Round of Dismissal Briefing

On December 6, 2023, the magistrate judge issued a third Report and Recommendation ("3rd R&R") addressing all of Defendants' arguments for dismissal, and recommending that Defendants' motion be granted in part and denied in part. JA232-258. The magistrate judge held Plaintiffs' motion for preliminary injunction in abeyance while the district court resolved Defendants' third motion to dismiss. Dkt. 141.

In the 3rd R&R, the magistrate judge declined to revisit organizational standing, noting that Plaintiffs had "bolstered" their allegations "with greater detail." JA240. The magistrate judge also agreed that the FAC, unlike the original complaint, sufficiently established DRSC's associational standing under *Hunt v. Washington*

*State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). JA241-244.

Having concluded that Plaintiffs had both organizational and associational standing under Article III, the magistrate judge turned to Defendants' Rule 12(b)(6) arguments. Incorporating the reasoning of the 2nd R&R, the magistrate judge again recommended dismissal of Plaintiffs' organizational claims for failing to state cognizable causes of action under Section 1983. JA247 ("[P]laintiffs' Amended Complaint does not change the court's analysis."). Specifically, the 3rd R&R concluded that the FAC "raises no claims based on organizational standing" because it only "seek[s] to vindicate the rights of the juveniles incarcerated at DJJ, not the rights of the organizations themselves." JA247. Because it expressly adopted the reasoning of the 2nd R&R, and otherwise avoids the issue entirely, the 3rd R&R cannot be read as recommending dismissal of Plaintiffs' organizational claims under the ADA, RA, or IDEA as outside the zone-of-interests of those statutes.

As to DRSC's associational claims, the magistrate judge recommended denying Defendants' motion to dismiss DRSC's Fourteenth Amendment claims. The magistrate judge agreed that the Fourteenth Amendment requires DJJ to protect incarcerated juveniles from violence, not to excessively or inappropriately use solitary confinement, to provide adequate rehabilitative services, and provide for their basic well-being, and that the FAC plausibly alleged that

DRSC's constituents faced violations of each right. JA249-253. As to the statutory claims, however, the magistrate judge recommended a finding that Plaintiffs failed to state a claim, concluding that Plaintiffs provided "no specific allegations that [any disabled] juveniles are being denied services, programs, or activities, or that their disabilities are motivating or sole causes of purported discrimination to show a violation of the ADA or Rehabilitation Act," and that "[a]s to the IDEA, the plaintiffs fail to allege specific facts showing that their constituents are being denied meaningful access to a FAPE." JA255-256.

Both Plaintiffs and Defendants filed objections to the 3rd R&R. JA259-312. Plaintiffs requested expedited consideration of the objections. JA284. On February 16, 2024, the case was reassigned from District Court Judge Mary Geiger Lewis to District Court Judge Jacquelyn D. Austin. Dkt. 154.

On October 9, 2024, Plaintiffs requested a status conference on the motion to dismiss, as the objections had been fully briefed since January 10, 2024. Dkt. 165. On November 1, 2024, the district court held a telephone status conference. Dkt. 169. There, the district court ordered Plaintiffs to reveal whether the thirteen children referenced in the FAC remained in DJJ custody, and allowed both parties to file supplemental authorities. *Id*. Plaintiffs filed a status report noting that, in the fourteen months since the FAC was filed, eleven of the thirteen children specifically identified in the FAC had been released or

transferred from DJJ custody. *See* JA367. Fearing that the court might consider an issue not briefed by either party, Plaintiffs briefly explained that the release of those specific children did not affect either standing or mootness. JA367-368. Plaintiffs reminded the court that, at any time, DRSC represents dozens of children at DJJ and that the FAC established "ongoing, pervasive and systemic problem[s]" where "the constant existence of [DRSC] constituents suffering the deprivation is certain." JA367-368 (citing *Mink*, 322 F.3d at 1116-18). Plaintiffs offered to supplement the factual record and cited public reporting showing that "horrific conditions persist" at DJJ. JA369.

On December 18, 2024, the district court dismissed the FAC. JA375-403. It held that DRSC only had associational standing to vindicate harms to its *identified* constituents, JA390-398 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-98 (2009)), and that the release of those nine constituents rendered its associational claims moot. JA395-396. Addressing mootness *sua sponte*, the court ignored the Ninth Circuit's analysis in *Mink*, the only case addressing this concept in the context of a P&A organization. JA395-396.

The district court also dismissed all of Plaintiffs' organizational claims for failure to state a claim. The court agreed with the magistrate judge that Plaintiffs' Section 1983 claims failed because the FAC "d[id] not allege that the Plaintiff organizations were deprived of their own constitutional or statutory rights." JA401-402 (citation omitted). The

district court did not substantively address Plaintiffs' ADA, RA, or IDEA claims, but in a footnote, stated incorrectly that Plaintiffs only objected to the magistrate judge's recommendations as to the Section 1983 claims. *Compare* JA400 *with* JA299-311 ("Plaintiffs state plausible claims for relief under the ADA, Rehabilitation Act, and IDEA."). Accordingly, the district court applied a "clear error" standard and ordered dismissal of those claims as well. JA400.

This appeal followed.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). This Court "review[s] a district court's grant of a motion to dismiss de novo. In deciding such a motion, [the court] accept[s] as true all of the factual allegations contained in the complaint, and draw[s] all reasonable inferences in favor of the plaintiff." *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 191-92 (4th Cir. 2015) (internal marks and citation omitted).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order of dismissal, and order that Defendants' third motion to dismiss be denied in full. The district court committed errors of law as to all of Plaintiffs'

dismissed claims, each of which requires reversal of the district court's order.

**I.** Plaintiff DRSC's associational claims are not moot. DRSC still has constituents in DJJ custody who are being physically and psychologically harmed by systemic violations of the Fourteenth Amendment, the ADA, RA, and IDEA. Yet the district court dismissed its claims as moot because the DRSC constituents specifically identified in the FAC were no longer in DJJ custody. That is a misreading of the Supreme Court's mootness precedent, which requires a showing that it would be "*impossible* for a court to grant *any effectual relief whatever* to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (emphasis added) (internal marks and citations omitted). The district court's ability to order improved conditions for children in DJJ custody would undoubtedly grant relief for DRSC's constituents who are still in DJJ custody.

The district court misapplied *Summers*, which does not require as a matter of law that Plaintiffs specifically identify their constituents, by name or pseudonym. Rather, Plaintiffs must establish concretely that their constituents face current or imminent harm. Here, unlike the "statistical probability" rejected in *Summers*, there is no dispute that DRSC still has constituents in DJJ custody. Thus, DRSC maintains standing.

Finally, even if DRSC's standing requires that its specifically identified children constituents remain detained throughout the case, then the Court should apply the "capable of repetition, yet evading review" exception to the mootness doctrine. Courts, including the Supreme Court and the Fourth Circuit, regularly apply this exception in the context of pretrial detention, which is inherently transitory. The district court held the "capable of repetition, yet evading review" doctrine did not apply because it found the same DJJ constituents must be at risk of re-incarceration, but it is DRSC—not its individual constituents—that anchors the exception's "same complaining party" requirement.

**II.** The district court ruled that Plaintiffs' organizational harms are not actionable under 42 U.S.C. § 1983 because they "failed to allege how their *own* Fourteenth Amendment rights have been violated." JA402. But it is well-settled that Section 1983 is not so limited. *See, e.g.*, *Planned Parenthood S. Atl.*, 26 F.4th at 608 n.* (rejecting this interpretation of Section 1983 as "*meritless*" (emphasis added)); *Vote.Org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023) (same) ("Section 1983 plaintiffs, ... *often* have been allowed to vindicate the rights of others." (emphasis added) (collecting cases)). By adopting the magistrate judge's "zone-of-interests" analysis, which asks "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,

572 U.S. 118, 127 (2014),[5] the district court erred for three separate reasons.

**First**, *Lexmark* does not limit Section 1983 claims that assert constitutional violations. "[T]he zone-of-interests analysis, ... asks whether 'this particular class of persons has a right to sue under this *substantive* statute.'" *Lexmark*, 572 U.S. at 127 (citation omitted). Because Section 1983, like the APA in *Lexmark*, "is not itself a source of substantive rights," *Albright v. Oliver*, 510 U.S. 266, 271 (1994), it does not define the "zone-of-interests" sought to be protected by Congress. Thus, the zone-of-interests test is conceptually inapplicable to Section 1983 claims asserting *constitutional* violations. *See Sierra Club v. Trump*, 929 F.3d 670, 701-02 (9th Cir. 2019) ("*Lexmark* focuses on *Congress's intent* in creating statutory causes of action, ... [b]ecause the Constitution was not created by any act of Congress, it is hard to see how the zone-of-interests test would even apply."), *stayed by* 140 S. Ct. 1 (2019) (per curiam).

**Second**, the text, purpose, history, and precedent surrounding Section 1983 all establish that Plaintiffs' organizational claims are well within the zone of interests of that statute.

Section 1983 was enacted "to give a broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs. of N.Y.*,

[5] Sometimes also referred to by courts as "statutory standing" or "prudential standing." *Lexmark*, 572 U.S. at 127-28, 128 n.4.

436 U.S. 658, 685, 700-01 (1978). For that reason, the Supreme Court "ha[s] repeatedly held that the coverage of [Section 1983] must be broadly construed." *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 105 (1989). Indeed, for at least a century, the Supreme Court has allowed organizational, representational, and third-party claims to be brought under Section 1983. *See, e.g.*, *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-36 (1925) (orphanage allowed to challenge Oregon's compulsory school attendance law); *Allee v. Medrano*, 416 U.S. 802, 819 n.13 (1974) ("Unions may sue under 42 U.S.C. § 1983 as persons."); *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 171-72 (2023) (wife of man in nursing home permitted to sue under Section 1983 to enforce certain FNHRA provisions). Following the Supreme Court's lead, circuit courts have embraced exactly the sort of claims alleged by Plaintiffs here. *See, e.g.*, *Nnebe v. Daus*, 644 F.3d 147, 156-58 (2d Cir. 2011) (organization allowed to vindicate direct, non-constitutional injuries caused by violations of others' Fourteenth Amendment rights); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 623-24 (6th Cir. 2016) (same).

**Third**, the remedy-extension provision of 42 U.S.C. § 1988(a) further buttresses Plaintiffs' claims. Section 1988 was enacted to further extend the reach of federal civil rights statutes. *See Moor v. Alameda Cnty.*, 411 U.S. 693, 702 & n.13 (1973). In addition to its fee-shifting provision, Section 1988 also "authorize[s] federal courts ... to

look to ... state law" when determining who may sue under Section 1983. *Id*. at 702-03; *see also Abraugh v. Altimus*, 26 F.4th 298, 302 (5th Cir. 2022) (holding that nonconstitutional standing under Section 1983 is "guided by 42 U.S.C. § 1988" (citation omitted)). Thus, because South Carolina law recognizes organizational standing and grants Plaintiff DRSC special, statutory standing, it violates the text and purpose of Section 1988 to deny federal review of Plaintiffs' organizational claims under Section 1983.

**III.** The district court misinterpreted the record and legally erred by dismissing Plaintiffs' organizational claims for lack of statutory standing under the ADA, RA, or IDEA.

**First**, this argument was not before the district court. Contrary to footnote 15 of the district court's opinion, the 3rd R&R's zone-of-interests analysis does *not* recommend dismissal of Plaintiffs' ADA, RA, and IDEA claims. Defendants did not move to dismiss the FAC on those grounds. *See* JA149-179. Predictably, then, the magistrate judge did not address that argument or recommend dismissal on those grounds. *See* JA247 ("[P]laintiffs' Amended Complaint does not change the court's analysis." (citing JA049-058)). Plaintiffs strenuously objected to the dismissal of their statutory claims, *see* JA297-309, but did not specifically discuss the zone-of-interests analysis that they (successfully) argued earlier in the litigation. *Compare* Dkt. 89 at 25 (explaining Plaintiffs' statutory standing under the ADA, RA, and

IDEA), *with* JA052-053 (agreeing with Plaintiffs, and citing the same cases). On that record, it was nonsensical for the district court to apply a deferential "clear error" standard to a *waived* argument. *See Del Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867 (4th Cir. 2016), 817 F.3d at 872 (holding that statutory standing arguments are waivable).

**Second**, it is well established that Congress intended that the ADA, Rehabilitation Act, and IDEA be coextensive with Article III. *See Disability Rts. Pa. v. Pa. Dep't of Hum. Servs.*, No. 19-cv-737, 2020 WL 1491186, at *9 (M.D. Pa. Mar. 27, 2020) ("[U]nder [the ADA and RA], a plaintiff is within the zone-of-interests if they have Article III standing."); *Fam. & Children's Ctr., Inc. v. Sch. City of Mishawaka*, 13 F.3d 1052, 1061 (7th Cir. 1994) ("Congress has implicitly granted standing under the IDEA to the limits of Article III."). Thus, given that the district court held that Plaintiffs' organizational injuries established Article III standing as to all claims, it was clear error to dismiss their statutory claims under Federal Rule of Civil Procedure 12(b)(6).

## ARGUMENT

### I. DRSC's associational claims are not moot.

There is no dispute that DRSC (now and always) represents dozens of constituents in Defendants' custody. There is also no dispute that those child-constituents are presently and continuously suffering from pervasive, systemwide constitutional and statutory deprivations.

DRSC easily clears the low bar for showing that it still has a live interest in this case.

### A. DRSC's associational claims are not moot because many of its harmed constituents remain in custody.

Defendants never raised mootness in their third motion to dismiss, nor was the issue briefed during the proceedings below. *See generally* JA149-179. For good reason: DRSC still has members in Defendants' custody facing the systemic harms alleged in the FAC.

This Court has described mootness as a "relatively weak constraint on federal judicial power." *United States v. Springer*, 715 F.3d 535, 540 (4th Cir. 2013). Indeed, a "case becomes moot *only* when it is *impossible* for a court to grant *any effectual relief whatever* to the prevailing party." *Knox*, 567 U.S. at 307 (emphasis added). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984). Although the Supreme Court has described mootness as "the doctrine of standing set in a time frame," it has also cautioned against conflating the two doctrines, noting a higher burden for defendants to show a case should be "abandon[ed]" due to purported mootness after the plaintiff had already established standing. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189, 191-92 (2000) (noting that there are exceptions to mootness, but not standing).

DRSC plausibly alleged that it has members in Defendants' custody who are harmed by systemic policies and practices, including rampant violence, regular use of isolation, and a lack of rehabilitative services. *See, e.g.*, JA125-132 (explaining the systemic and pervasive constitutional and statutory deprivations facing DRSC and its constituents). Defendants have not disputed that DRSC does, and will always, have constituents in DJJ custody. Indeed, DJJ admits that the "majority" of children detained at DJJ "meet criteria for at least one mental health disorder." JA130. Thus, even with the release of the specific nine constituents DRSC identified by the FAC, many DRSC constituents remain in DJJ custody. *See, e.g.*, JA129 ("By law, all children with mental illness that are held at DJJ are constituents of DRSC."). Absent relief, harms to DRSC members therefore will persist.

Far from an *impossibility*, there is ample relief that would remedy DRSC's associational claims, at least in part. For instance, DRSC members still in DJJ custody face the following systemic harms, which have not been challenged at this stage:

- **Pervasive and Extreme Violence:** All children detained at DJJ face historic levels of violence from both other detained children and staff members, as a matter of systemic and programmatic operating decisions by Defendants. JA089-096. This level of violence impacts DRSC constituents disproportionately, as children with mental health disorders and other disabilities are

more likely to be attacked, JA130, and for their conditions to worsen as a result of the attacks and/or pervading sense of fear.

- **Systemic Use of Isolation:** As a matter of practice and policy, Defendants routinely impose severe forms of isolation on the children in their custody, which also disproportionately impacts DRSC constituents. JA096-102 (alleging, *e.g.*, that DJJ "ignores mental diagnoses and places children in isolation despite, and very often because of, their mental disabilities").
- **Absence of Rehabilitative Services and Sanitary Conditions:** Defendants do not provide the necessary levels of education, recreation, other rehabilitative services, or even basic sanitary conditions. JA102-112. These failures disproportionately harm DRSC constituents. *See, e.g.*, JA104 (alleging that instead of the legally required "special education and related services to detained youth with disabilities," DJJ sporadically hands out the same worksheets to all detained youth); JA107 (DJJ fails to provide regular access to medication and counseling).

As the district court already recognized, it has the power to enter an order "mandating improved conditions at SCDJJ." JA034. Thus, there remains the "possib[ility]" of DRSC obtaining "any effectual relief." *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 295 (2023) (noting that Supreme Court case law "disfavor[s] ... mootness arguments" about the plaintiff's ultimate likelihood of success).

Only one court has addressed the precise issue at hand, and it supports reversal. In *Mink*, the Ninth Circuit held that an action brought by a P&A (like DRSC) is not mooted merely because its identified constituents are released from custody. 322 F.3d at 1116-18. *Mink* addressed a P&A's challenge to the detention of incapacitated criminal defendants in county jails, and held that even though all seven constituents identified in the complaint were released later in the case, the action was not moot. *Id.* The court refused to dismiss where the P&A alleged "an ongoing, pervasive and systemic problem," where the defendant "proffered no evidence to suggest that [the] problem ha[d] ceased," and where there continued to be other constituents of the P&A "suffering the deprivation" at issue. *Id.* at 1117-18. The same is true here.

The district court's mootness holding rests on at least two separate errors.

**First**, the district court wrongly concluded that because the specific DRSC constituents identified in the FAC had been released, "there [was] no longer a live controversy and [DRSC] thus has no one to represent." JA397. This statement is factually and legally incorrect. As explained above, the plausible allegations in the FAC show that DRSC still has constituents in Defendants' custody who are facing severe harm, and thus DRSC maintains a strong concrete interest in this matter.

Rather than following (or even acknowledging) *Mink*, the district court rested its holding primarily on two other cases with inapposite facts. In *Munsell v. Department of Agriculture*, a trade association's claims were held moot because the member company ("MQF") was the "*only* [association] member that ha[d] challenged specific USDA enforcement actions," and MQF later divested itself of the business that was subject to USDA enforcement. 509 F.3d 572, 583-84 (D.C. Cir. 2007). Similarly, in *Milwaukee Police Ass'n v. Board of Fire & Police Commissioners of City of Milwaukee*, the union's claims were moot because its claims hinged on a single employee's claim for unfair termination, and that employee later settled. 708 F.3d 921, 929 (7th Cir. 2013). The district court's conclusion here that there was "no longer a live controversy and [the association] thus has no one to represent," JA397, may have been true in *Munsell* and *Milwaukee*, because each association's claims rested on the injury to a single, mooted-out individual. But it is false here, where DRSC continues to represent many individuals in DJJ custody who are experiencing harm.

**Second**, the district court was wrong that DRSC's standing depends on the specific DRSC constituents who are identified in the FAC.

In *Summers v. Earth Island Institute*, the Supreme Court held that to establish associational standing, an association must show that the challenged conduct "threatens imminent and concrete harm to the

interests of their members." 555 U.S. 488, 495 (2009). The Court rejected a reliance on a "statistical probability that some of those members are threatened with concrete injury," and held instead that it must be established that members *would* suffer harm. *See id.* at 498.

But *Summers* does not hold that every complaint alleging an associational harm must *specifically* identify harmed members. Six years after *Summers*, in *Alabama Legislative Black Caucus v. Alabama*, the Supreme Court held that evidence that a plaintiff organization has members "statewide" and in "almost every county" was sufficient to support the inference that it had harmed members "in each majority-minority district." 575 U.S. 254, 270 (2015). As courts in this Circuit have subsequently held, "*Alabama* moderates [*Summers*] . . . [O]rganization[s] need not identify individual members so long as a reasonable inference can be drawn that such individuals exist." *Democratic Party of Va. v. Brink*, 599 F. Supp. 3d 346, 355 n.10 (E.D. Va. 2022); *see also Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 658 (M.D.N.C. 2024) (under *Summers*, an organization must identify affected members "unless all members of the organization are harmed").

The district court held that DRSC satisfied *Summers* because the FAC referenced nine individuals, designated "Child 5" through "Child 13," and described in detail the harms they suffered. JA394. But DRSC was not *required* to provide these illustrative details to establish standing, and thus the release of those nine children from DJJ does not

make DRSC's claims moot. As noted above, by statutory mandate, "all children with mental illness that are held at DJJ are constituents of DRSC." JA129 (noting that "Children 5-13 are only a few of DRSC's constituents in DJJ custody"). There is thus not just a "statistical probability" that DRSC constituents beyond Children 5-13 face imminent harm, but a *certainty*.

In *South Carolina State Conference of NAACP v. Alexander*, a three-judge panel (including a member of this Court) rejected the same requirement the district court imposed below. No. 21-cv-3302, 2022 WL 453533, at *2 (D.S.C. Feb. 14, 2022). The court held that the NAACP State Conference "plausibly alleged" associational standing by alleging that it had voting members in "each challenged district" of its racial gerrymandering action. *Id.* The court rejected the defendants' argument that the plaintiffs had to "identify at least one of their members" in each district as "misunderstand[ing] the [plaintiffs'] burden at the pleading stage." *Id.* at *3 (citing *Ala. Black Caucus*, 575 U.S. at 270). "Absent contrary evidence," the court was obligated to accept the plaintiff's "plausible allegation" regarding its membership. *Id.*; *see also, e.g.*, *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1162-64 (11th Cir. 2008) (holding that the Florida NAACP had standing to challenge state election law expected to cause the illegal rejection of 1% of ballots); *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1170 (M.D. Ala. 2016) (holding that a P&A challenging prison conditions "need only show the *high*

*likelihood* of the existence of a member who will be harmed by the challenged policy or practice, but need not identify any particular member with such standing").

Through its statutory mandate and its detailed allegations of Defendants' deficiencies and the resulting harms, DRSC has established that its constituents—beyond the nine described in the FAC in September 2023—face continuing harm. Therefore, DRSC's associational claims are not moot.

### B. Alternatively, DRSC's claims fit an exception to mootness.

If this Court concludes that DRSC's associational claims are moot, it should still reverse because DRSC's claims fall into an established exception to mootness: capable of repetition yet evading review.

The "capable of repetition" exception applies "when '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Springer*, 715 F.3d at 541 (quoting *Spencer v. Kemna,* 523 U.S. 1, 17 (1998)). Under this doctrine, "a change in an individual's confinement status does not moot the individual's challenge" based on that prior confinement. *Id.* (collecting cases). DRSC's associational claims meet the elements of this exception to mootness.

(1) **Evading Review.** DRSC's claims are particularly likely to evade review because "[p]retrial detention is by nature temporary, and it is most unlikely that any given [detained] individual could have his constitutional claim decided on appeal before he is either released or convicted." *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). Like adult pretrial detention facilities, DJJ's juvenile detention facilities are transitory. Four of the five secure facilities operated by DJJ are short-term facilities: one is a pretrial detention facility (JDC), three are temporary evaluation centers (MEC, UEC, CEC) that can only hold children for 45-days, S.C. Code § 63-19-1440(C), and only one holds longer-term commitments (BRRC). JA082-085. The procedural history of this case shows that it is impossible to "fully litigate" the claims of specific children before the claims expire. *Springer*, 715 F.3d at 541. Five-hundred five days elapsed between the filing of Plaintiffs' Original Complaint and the district court's first order dismissing Plaintiffs' claims. *Compare* Dkt. 1 (4/26/2022), *with* JA063 (9/14/2023). Another 447 days elapsed between the filing of the FAC and the district court's operative order of dismissal. *Compare* JA069 (9/28/2023), *with* JA375 (12/18/2024). Almost three years into the case, the district court has yet to engage with Plaintiffs' request for preliminary relief—much less considered permanent relief. Given that most of DRSC's claims challenge conditions at short-term detention and evaluation centers, it is impossible that any "individual [child] could have his constitutional

claim decided on appeal before he is either released[,] or convicted," or transferred to adult prison. *Gerstein*, 420 U.S. at 110 n.11.

(2) **Capable of Repetition.** To demonstrate an injury is capable of repetition, the party seeking relief must also show "a reasonable expectation that the same complaining party [will] be subject to the same action again." *Springer*, 715 F.3d at 541 (citation omitted). Here, there is no dispute that DRSC has constituents who continue to be detained in DJJ facilities. Consequently, there is not just a "reasonable expectation" that DRSC's constituents, and therefore DRSC, will be subject to harm at DJJ's hands; there are concrete allegations of that ongoing harm.

In concluding otherwise, the district court reasoned that the "'same complaining party' requirement" is only met "when there is a reasonable expectation that *one of the identified juveniles* will be subject to the same action again." JA398 (emphasis added) (citation omitted). But DRSC—not the nine juveniles identified in the FAC—is the "complaining party" here, and the FAC unquestionably shows that *DRSC* will suffer the same harms, through its members, again and again until conditions drastically improve.

The district court cited no precedent for its view of the "same complaining party" element, and cases from across the federal courts point the other way. In *Memphis A. Philip Randolph Institute v. Hargett*, for example, the Sixth Circuit concluded that the unique facts

of COVID litigation made it such that "[t]here is not a reasonable expectation that [plaintiff], *other members of the plaintiff organizations*, or the public will face the same burdens as voters did in the fall of 2020." 2 F.4th 548, 561 (6th Cir. 2021) (emphasis added). Likewise, the Second Circuit routinely permits associational or representational claims to continue so long as the interests represented by the plaintiff endure throughout the litigation. *See Cook v. Colgate Univ.*, 992 F.2d 17, 20 (2d Cir. 1993) (collecting cases); *Doherty v. Bice*, 101 F.4th 169, 173 (2d Cir. 2024), *cert. denied,* 145 S. Ct. 381 (2024) (finding mootness where "[plaintiff] is not suing in a representative capacity on behalf of similarly situated individuals"); *see also Blondell v. Bouton*, No. 17-cv-372, 2019 WL 12338323, at *7 (E.D.N.Y. Mar. 29, 2019) ("[C]ourts have adopted a distinct exception to the mootness doctrine, allowing suits to survive even after named plaintiffs no longer have 'a legally cognizable interest in the outcome,' where plaintiffs sue in a representative capacity." (collecting cases)).

In *Trachtman v. Anker*, for example, the Second Circuit refused to moot a case asserting a First Amendment challenge to a school policy when the lone plaintiff "may no longer be a member of the student body" because it concluded that, "[a]lthough the complaint did not formally so assert, [the plaintiff] was litigating in a representational capacity." 563 F.2d 512, 514 n.1 (2d Cir. 1977) ("[W]e have no doubt that there is a proper adversary relationship here to assure proper

presentation of the issues (plaintiffs are represented by an attorney affiliated with the New York Civil Liberties Union), ... and plaintiffs may be considered as acting on behalf of a student association and its members who have a continuing stake in this litigation." (citations omitted) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977))).

The application of this exception is further supported by Supreme Court precedent in an analogous context: the "relation back" exception. The Supreme Court has instructed that, to avoid mootness, parties must maintain "concrete adverseness." *E.g. Camreta v. Greene*, 563 U.S. 692, 701 (2011) ("[T]he opposing party also must have an ongoing interest in the dispute, so that the case features '*that concrete adverseness which sharpens the presentation of issues*.'" (citation omitted)). The "relation back" doctrine developed as an exception to mootness because, in class actions, "concrete adverseness" is often maintained by the live claims of unnamed class members, even when a class representative's claim becomes moot. *See Franks v. Bowman Transp. Co.*, 424 U.S. 747, 752-56 (1976) (class action not moot because "unnamed members of the class are entitled to the relief already afforded [the named plaintiff], ... and thus ... assure that *concrete adverseness which sharpens the presentation of issues*" (emphasis added (internal marks and citation omitted))). The same can be true in associational claims. *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367,

402-03 (2024) (Thomas, J., concurring) (a claim brought under a theory of associational standing is "effectively ... a class action."). In fact, the Supreme Court has extolled associational claims as being especially good at "*assur[ing] that concrete adverseness which sharpens the presentation of issues* upon which the court so largely depends." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289 (1986) (emphasis added) (internal marks and citation omitted).

Accordingly, both prongs of the exception are met: (1) Defendants' unconstitutional treatment of DRSC's constituents is too short in duration to be fully litigated, and (2) as the South Carolina P&A, DRSC is certain to continue to have constituents detained and mistreated by Defendants.

## II. Plaintiff organizations have prudential standing to bring claims under Section 1983.

"There exist two strands of standing: Article III standing, which ensures that a suit presents a case or controversy as required by the Constitution, and 'prudential standing,' which encompasses 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 753 (4th Cir. 2013) (quoting *Allen*, 468 U.S. at 751). Below, the district court correctly held that Plaintiffs established Article III standing, *see, e.g.*, JA388, JA402, but determined that Plaintiffs lacked prudential standing because they "failed to allege

how their *own* Fourteenth Amendment rights have been violated." JA402. That was error.[6]

"Federal courts, ... have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). To that end, the Supreme Court has long-cautioned that "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Id.* (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

The doctrine of prudential standing—more recently called "statutory standing" or a "zone-of-interests" analysis—is a narrow departure from that general rule. *See Lexmark*, 572 U.S. at 125-26, 128 n.4 (acknowledging that the zone of interest analysis "is in some tension" with courts' obligation to hear and decide cases). Simply put, "the zone-of-interests analysis, ... asks whether this particular class of persons ha[s] a right to sue under this substantive statute." *Id.* at 127 (internal marks and citation omitted). That analysis "requires [a court] to determine, using traditional tools of statutory interpretation,

[6] The district court reasoned that it "need not analyze Plaintiffs' ... zone-of-interests argument," because it "accept[ed] the Magistrate Judge's recommendation that Plaintiffs have failed to allege a deprivation of their own constitutional or statutory rights." JA403 n.17. But as the magistrate judge properly understood, those arguments are indistinguishable. *See* JA247 (3rd R&R) (conducting zone-of-interests analysis).

whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* The standard "is not meant to be especially demanding," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citation omitted), and requires only that a claim not be "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit," *Thompson v. North America Stainless, LP*, 562 U.S. 170, 178 (2011) (citation omitted). Unlike Article III standing, prudential standing "does not implicate ... the court's statutory or constitutional *power* to adjudicate the case," *Lexmark*, 572 U.S. at 128 n.4, and "the benefit of any doubt goes to the plaintiff," *id.* at 130 (citation omitted).

Plaintiffs' constitutional claims are cognizable whether viewed through the Fourteenth Amendment, Section 1983, or Section 1988.

A. Plaintiffs' organizational claims assert constitutional violations and need not satisfy a zone-of-interests test.

To start, the source of the zone-of-interests inquiry is not Section 1983. *Lexmark* applies to the source of a litigant's *substantive* rights. 572 U.S. at 127. Like the judicial review provisions of the APA, Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere." *Albright*, 510 U.S. at 271 (internal marks and citation omitted); *see, e.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 667-68 (9th Cir. 2021)

(holding that, although the action was brought under the APA, the relevant zone-of-interests depends on the underlying statute, the Immigration and Nationality Act). Therefore, "the zone-of-interests protected by [Section 1983] is coextensive with the zone-of-interests protected by the Constitutional right allegedly violated." *Jackson v. Sargent*, 394 F. Supp. 162, 167-68 (D. Mass.), *aff'd*, 526 F.2d 64 (1st Cir. 1975); *see also Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 87, 95 (2d Cir. 2009) (concluding that plaintiffs' claims, brought under Section 1983, were sufficiently within the zone-of-interests protected by the Commerce Clause).

It makes little sense to apply a zone-of-interests test, as modified by *Lexmark*, to constitutional claims. As the Ninth Circuit noted in its careful analysis in *Sierra Club v. Trump*, "*Lexmark* focuses on *Congress's intent* in creating statutory causes of action, ... [b]ecause the Constitution was not created by any act of Congress, it is hard to see how the zone-of-interests test would even apply." 929 F.3d at 702; *see also Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 48-49 (D.D.C. 2020) (finding *Sierra Club* "persuasive" and refusing to apply the zone-of-interests test to *ultra vires* claims). The Supreme Court's cases are consistent with this view. *Compare Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977) (considering "zone-of-interests" in Commerce Clause action pre-*Lexmark*), *with Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 552 (2019) (not

considering "zone-of-interests" in Commerce Clause action post-*Lexmark*). And courts in this circuit have followed that trend. *See NAPCO, Inc. v. Landmark Tech. A, LLC*, 555 F. Supp. 3d 189, 222 n.18 (M.D.N.C. 2021) ("After *Lexmark*, it is unclear whether the "zone of interest" test remains applicable to [defendant's] dormant Commerce Clause challenge.").

Even if a "zone of interest" test were applied, Plaintiffs' harms fall well within the zone-of-interests contemplated by the Fourteenth Amendment. Here, Plaintiffs have alleged that their organizations have suffered diversions of resources and frustrations of purpose—including interference with their ability to provide legally protected services—because of Defendants' unconstitutional treatment of children at DJJ. Justice 360, for its part, provides legal services to the children at DJJ that are required by the Due Process Clause of the Fourteenth Amendment. *See In re Gault*, 387 U.S. 1, 34-41 (1967) (holding that the Fourteenth Amendment requires appointment of counsel in juvenile proceedings that "may result in commitment"). Justice 360 has plausibly alleged that its ability to provide those services has been injured-in-fact by Defendants' constitutional violations. JA118-125. The same is true of DRSC. Under state and federal law, DRSC is required to provide a panoply of services to incarcerated children with disabilities. JA118-125; 42 U.S.C. § 10801 *et seq.*; S.C. Code § 43-33-310 *et seq.* But

its ability to do so has been significantly impeded by Defendants' widespread *Youngberg* violations. JA126.

Plaintiffs' organizational claims—which seek relief from interruptions to their ability to provide necessary services because of the egregious mistreatment of children by the State—are not "so marginally related to or inconsistent with the purposes [of the Fourteenth Amendment]," *Clarke v. Sec. Industry Ass'n*, 479 U.S. 388, 399 (1987), that the Court should apply "judicially self-imposed limits," *Allen v. Wright*, 468 U.S. 737, 751 (1984), and refuse to hear the case. Because Plaintiffs' organizational claims squarely align with the Fourteenth Amendment's protections, the district court was wrong to rule that Plaintiffs failed to state a cause of action.

B. Plaintiffs' organizational claims are consistent with the text, purpose, and precedent surrounding 42 U.S.C. § 1983.

Even if Section 1983 defines the relevant "zone of interest," Plaintiffs claims should still proceed. Section 1983 permits actions by "the party injured"—not merely by parties whose "*own* [constitutional] rights have been violated," JA402-403 (citing *Inmates v. Owens*, 561 F.2d 560, 562-63 (4th Cir. 1977)). In holding otherwise, the district court ignored the text of Section 1983 and glibly disregarded decades of precedent from this Court and the Supreme Court.

The district court's contrary textual analysis of Section 1983 (announced in the 2nd R&R, incorporated by the 3rd R&R, and adopted without discussion by the district court) might look familiar to this Court. It nearly perfectly mirrors the argument raised by the South Carolina Governor and Attorney General in *Planned Parenthood South Atlantic*. *Compare* JA050-051, *with* Appellants' Brief at 30-32, *Planned Parenthood S. Atl. v. Wilson*, No. 21-1369 (4th Cir. July 7, 2021), Dkt. 32. As it did there, this Court should deem those arguments "meritless." *See Planned Parenthood S. Atl.*, 26 F.4th at 608 n.1.

"By its express terms § 1983, ... is notable for the absence of qualification or limitation." *Blue v. Craig*, 505 F.2d 830, 834 (4th Cir. 1974) (internal marks and citation omitted). Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, *shall be liable to the party injured* in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added). Thus, the text of Section 1983 creates a cause-of-action for "the party injured." *Id.*

Plaintiffs meet that criterion. They allege that Defendant Hendrick "subjected, ... citizen[s] of the United States" (to wit: children in DJJ custody) "to the deprivation of any rights, privileges, or immunities secured by the Constitution" (to wit: Fourteenth Amendment rights to be free from violence, isolation, et cetera), and that they—as organizations—are "part[ies] injured," 42 U.S.C. § 1983. *See* JA402 (agreeing that "Plaintiffs allege that they have suffered diversions of resources and frustrations of purpose because of Defendant Hendrick's alleged unconstitutional treatment of children at DJJ"). Contrary to the district court's ruling, there is no textual basis for limiting "the party injured" to only those persons whose *own* constitutional rights were violated. As the Supreme Court explained in a similar context, there is "no other context in which th[ose] words carry this artificially narrow meaning." *Thompson*, 562 U.S. at 177 (rejecting a similarly narrow interpretation of who may sue under Title VII); *accord Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 193-94 (2017) (holding that "aggrieved person" within the FHA creates a cause of action for anyone injured by prohibited housing discrimination). As with Title VII and the FHA, Congress could have—and chose not to—limit use of Section 1983 to only "the party *whose constitutional or federal rights were violated*"; but instead, it created a cause of action for "the party injured." *See Thompson*, 562 U.S. at 177 ("Congress ... would more

naturally have said 'person claiming to have been discriminated against' rather than 'person claiming to be aggrieved'").

The history and purpose of Section 1983 further rebut the district court's cramped reading. *Cf. Lexmark*, 572 U.S. at 130 (noting that a "lenient approach" is "an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision"). Initially passed as part of the Ku Klux Klan Act, Section 1983's "critical concerns" were "compensation of the victims of unconstitutional action, and deterrence of like misconduct in the future." *Robertson v. Wegmann*, 436 U.S. 584, 599-600 (1978). As the Supreme Court explained in *Will v. Michigan Department of State Police*:

> Congress enacted § 1 of the Civil Rights Act of 1871, 17 Stat. 13, the precursor to § 1983, shortly after the end of the Civil War in response to the widespread deprivations of civil rights in the Southern States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers. Although Congress did not establish federal courts as the exclusive forum to remedy these deprivations, it is plain that Congress assigned to the federal courts a paramount role in this endeavor.

491 U.S. 58, 66 (1989) (internal marks and citations omitted).

The history and purpose of Section 1983 require that it be construed broadly. *See, e.g.*, *Dennis v. Higgins*, 498 U.S. 439, 443 (1991) ("A broad construction of § 1983 is compelled by the statutory language." (footnote omitted)); *Golden State Transit Corp.,* 493 U.S. at 105-06 ("We have repeatedly held that the coverage of [§ 1983] must be

broadly construed." (collecting cases)). At virtually every turn, courts have refused to curtail the availability of relief under Section 1983. *See, e.g.*, *Damico v. California*, 389 U.S. 416, 417 (1967) (holding that state exhaustion is not required before seeking relief under Section 1983); *Monell*, 436 U.S. at 700-01; *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1276, 1288 (11th Cir. 2021) ("Supreme Court precedent, successive amendments to § 1983, and longstanding, settled practice" all support concluding that "informal organization[s]" can use Section 1983 to "seek[] redress for injuries they may sustain."); *Battle v. Ledford*, 912 F.3d 708, 715-16 (4th Cir. 2019) (rejecting Virginia's no-tolling rule "as applied to prisoners seeking to bring § 1983 claims" because the rule would "frustrate[] the goals of § 1983").

The district court's rule—that Section 1983 plaintiffs can only vindicate their *own* constitutional or statutory rights—would close the courthouse doors to a legion of long-recognized plaintiffs. *See, e.g.*, *Vote.Org*, 89 F.4th at 473 (collecting cases). Plaintiffs are routinely allowed to bring Section 1983 claims on behalf of others. *See Health & Hosp. Corp. of Marion Cnty.*, 599 U.S. at 171-72 (wife of man in nursing home permitted to sue under Section 1983 to enforce certain FNHRA provisions); *June Med. Servs. v. Russo*, 591 U.S. 299, 318 (2020) (noting, in Section 1983 challenge, that the Supreme Court has "long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations"), *abrogated by*

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Craig v. Boren*, 429 U.S. 190, 195 (1976) ("[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function [through § 1983 actions]."). Indeed, the district court's ruling cannot even be squared with its own holding that DRSC can assert associational claims on behalf of its constituents. *See* JA394; *see also, e.g., Common Cause Ind. v. Lawson*, 937 F.3d 944, 952-53 (7th Cir. 2019) (collecting cases).

Organizational claims are no different. The Second Circuit, for example, has explained that "nothing prevents an organization from bringing a § 1983 suit on its own behalf so long as it can independently satisfy the requirements of Article III standing." *Nnebe*, 644 F.3d at 156-57 (holding that organization properly sought relief under Section 1983 from diversion of resources and frustration of purpose caused by denying procedural due process to taxi drivers); *see also Centro de la Hispana Comunidad de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109-11(2d Cir. 2017) (allowing two organizations to bring First Amendment challenge to town ordinance, despite alleging only "perceptible impairment" of its activities, not violations of their *own* First Amendment rights); *Ne. Ohio Coal. for the Homeless*, 837 F.3d at 623-24 (affirming standing of nonprofit organization to challenge Ohio voting laws under Section 1983). And although this Court appears not

to have squarely addressed the issue, organizations in this circuit have long been allowed to redress non-constitutional injuries under Section 1983. *See, e.g.*, *N.C. State Conf. of NAACP v. N.C. State Bd. of Elections*, 283 F. Supp. 3d 393, 402 (M.D.N.C. 2017) (finding standing where organization would divert resources to combat "en *masse* voter challenge[s]"); *see Voto Latino*, 712 F. Supp. 3d at 684 (showing of "perceptible impairment" sufficient to raise Fourteenth Amendment challenge to voting law).

Plaintiffs' organizational injuries are redressable under Section 1983. The district court's interpretation of Section 1983 would foreclose plaintiffs' claims clearly envisioned by Congress and long recognized by the courts. Such "absurd consequences 'should be avoided.'" *United States v. Jones*, 60 F.4th 230, 238 (4th Cir. 2023) (citation omitted), *summarily vacated*, 144 S. Ct. 1091 (2024). Given the statute's text and history, coupled with "Supreme Court precedent, successive amendments to § 1983, and longstanding, settled practice," *Food Not Bombs*, 11 F.4th at 1276-77, the district court's analysis of Section 1983 is "meritless," *Planned Parenthood South Atlantic*, 26 F.4th at 608 n.1, and its order dismissing Plaintiffs' organizational claims should be reversed.

### C. Plaintiffs' organizational claims are authorized by 42 U.S.C. § 1988.

Section 1988(a) offers yet a third basis for sustaining Plaintiffs' organizational claims, contrary to the district court's finding.

42 U.S.C. § 1988 was "intended to complement the various ... federal causes of action for the violation of federal civil rights." *Moor*, 411 U.S. at 702. To that end, Section 1988(a) "authorize[s] federal courts, where federal law is unsuited or insufficient 'to furnish suitable remedies,' to look to ... state law, so long as such principles are not inconsistent with the Constitution and laws of the United States." *Id.* at 702-03 (quoting 42 U.S.C. § 1988(a)).

Section 1988 cannot supplant the constitutional standing requirements of Article III, but its remedy-extension provision must inform the courts' *prudential* standing analysis in civil rights cases. The Fifth Circuit adopts this view, recently holding that nonconstitutional standing requirements in federal civil rights cases are "guided by 42 U.S.C. § 1988." *Abraugh*, 26 F.4th at 302 (citation omitted) (applying Section 1988 in action brought under Section 1983). In certain third-party standing contexts, this Court has done the same. *See Brown v. Town of Cary*, 706 F.3d 294, 299-300 (4th Cir. 2013) (applying state survivorship rule to permit First Amendment claim under Section 1983).

This method is consistent with the animating goals of federal civil rights statutes; namely, to "provide[] a remedy where state law was inadequate" and "to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." *Monroe v. Pape*, 365 U.S. 167, 173-74 (1961), *overruled on other grounds by Monell*, 436 U.S. 658 (1978). As Congress recognized in enacting Section 1988(a), it is contrary to these goals to refuse federal jurisdiction to a civil rights claimant who would, under state rules, have a viable cause of action.

South Carolina law holds that Plaintiffs' organizational claims are viable. *See, e.g.*, *Prot. & Advoc. for People with Disabilities, Inc. v. S.C. Dep't of Disabilities & Special Needs*, 783 S.E.2d 835, 838 (S.C. Ct. App. 2016) (holding P&A organization has statutory and constitutional standing to seek relief for its injuries); *Energy Rsch. Found. v. Waddell*, 367 S.E.2d 419, 420 (S.C. 1988) (an organization can sue if it shows it has been directly harmed). Section 1988(a)'s remedy extension and gap-filling provision, then, provides further grounds for reversal.

## III. Plaintiffs' organizational claims for relief are viable under the ADA, Rehabilitation Act, and IDEA.

It is well settled that Plaintiffs may state claims for relief under the ADA, RA, and IDEA, based on organizational injuries like the diversions of resources and frustration of purposes. Each statute creates a cause of action that is coextensive with Article III standing. *Disability*

*Rts. Pa.*, 2020 WL 1491186, at *9 ("[U]nder [the ADA and RA], a plaintiff is within the zone-of-interests if they have Article III standing."); *Fam. & Children's Ctr.*, 13 F.3d at 1061 ("Congress has implicitly granted standing under the IDEA to the limits of Article III."). Below, Plaintiffs repeatedly cited this law, *see, e.g.*, JA196, and the magistrate judge agreed. *See* JA052-053. After the 2nd R&R adopted this rule, Defendants stopped raising the argument. *Compare* Dkt. 81 at 11 ("[Plaintiffs'] conclusory, law-review-style complaint does not fall within the zone-of-interests protected by the Fourteenth Amendment, Section 1983, *the ADA, the Rehabilitation Act, or the IDEA*." (emphasis added)), *with* JA164 (arguing only that "Plaintiffs are not in the zone-of-interests *protected by Section 1983*." (emphasis added)).

At the time of the district court's opinion and order, Defendants were no longer arguing that Plaintiffs lacked statutory standing to bring their organizational claims under the ADA, RA, or IDEA, nor was the magistrate judge recommending dismissal on that ground. Yet puzzlingly, the district court found that Plaintiffs had "waived" any objection to this un-raised issue and ordered dismissal.[7] That was error.

---

[7] If anything, waiver cuts the other way. Unlike Article III standing, questions of statutory standing are waivable. *Del Webb Cmtys.*, 817 F.3d at 872 (citation omitted). Although most circuits agree that courts retain discretion to consider statutory standing issues *sua*

A. Plaintiffs established Article III injuries arising from Defendants' statutory violations.

Throughout the case, the district court rightly held that Justice 360 has constitutional standing to assert each claim—including the statutory claims under the ADA, RA, and IDEA. *See* JA032-035; JA388-389.

**Justice 360.** DJJ's failures to identify and accommodate the needs of children with disabilities perceptibly impairs Justice 360's representation of children in DJJ custody and has caused it to expend additional resources to address those issues. For example: Child 1, a client of Justice 360, exhibits signs of paranoia, depression, and PTSD, but "has never been evaluated, diagnosed, or treated for th[o]se disorders." JA120. Child 1 has "physically and emotionally deteriorated during incarceration," JA120, and his mental health now substantially impairs his ability to communicate with his attorney, JA120-121, which is a major life activity. *See McAlindin v. Cnty. of San* Diego, 192 F.3d 1226, 1234 (9th Cir. 1999) ("[I]nteracting with others is an essential,

---

*sponte*, waived issues generally cannot be argued unless the party raised it in the district court. *See, e.g.*, *Bd. of Mississippi Levee Comm'rs v. U.S. E.P.A.*, 674 F.3d 409, 418 (5th Cir. 2012) ("Although the EPA correctly points out that we have previously considered the issue *sua sponte,* we decline to do so here." (internal marks and citations omitted)). Here, where Defendants' shifting arguments plainly demonstrate an "intentional relinquishment or abandonment of a known [argument]," *Wood v. Milyard*, 566 U.S. 463, 474 (2012) (citation omitted), the district court was wrong to consider it at all.

regular function, like walking and breathing, it easily falls within the definition of 'major life activity.'" (citation omitted)). In violation of the ADA and RA, Child 1 has been repeatedly isolated and denied accommodations. JA120; *see G.H. ex rel. Henry v. Marstiller*, 424 F. Supp. 3d 1109, 1119-20 (N.D. Fla. 2019) (failure to accommodate behavioral needs of disabled children and repeated use of isolation adequate to allege violations of ADA and RA).

**DRSC.** DJJ's violations of the ADA, RA, and IDEA also inflict traceable, redressable, injuries-in-fact upon DRSC. For example: DRSC pleads that it struggles to identify *which* incarcerated children qualify for its support because of "DJJ's failure to properly evaluate or identify children in its custody with mental illness or disabilities." JA127. That sufficiently states a cause of action under IDEA's child-find duty. *See* 20 U.S.C. § 1412(a)(3); *see, e.g.*, *T.H. ex rel. T.B. v. DeKalb Cnty. Sch. Dist.*, 564 F. Supp. 3d 1349, 1357-59 (N.D. Ga. 2021) (holding sheriff liable for "systemic violations" of the IDEA, including the jail's failure to screen child-detainees for disabilities in violation of IDEA). Because of Defendant DJJ's violation of the child-find duty, DRSC must "expend additional resources and time identifying which children fall within its statutory mandate," and still "cannot fulfill its statutory mission." JA127.

B. The magistrate judge did not recommend (and Plaintiffs did not waive objections to) the dismissal of Plaintiffs' statutory claims alleging organizational harms.

In a footnote, the district court erroneously concluded that the 3rd R&R "recommends that all of Plaintiffs' organizational standing claims be dismissed under Rule 12(b)(6)," and that Plaintiffs' objected "only as to the § 1983 claims." JA400 (citations omitted).[8] That is doubly wrong.

**First**, the record shows that the magistrate judge did *not* recommend dismissal of Plaintiffs' *organizational* claims brought under the ADA, RA, and IDEA. The district court interpreted the magistrate judge's zone-of-interests analysis, JA246-247, as recommending dismissal of "all of Plaintiffs' organizational standing claims," JA400 n.15. But, vitally, that section of the 3rd R&R expressly incorporates the magistrate judge's analysis from the 2nd R&R, JA049-053, JA247 ("[P]laintiffs' Amended Complaint does not change the court's analysis.") (citing JA049-058), which concluded that the ADA, RA, and IDEA each permit actions brought by *any party with Article III standing*. JA052 (explaining that statutory remedies under the ADA and RA "are not limited to qualified individuals with disabilities"), JA053 ("[T]he IDEA's text permit[s] 'any party aggrieved' to bring a

---

[8] Confoundingly, the district court writes elsewhere that "Plaintiffs object to the Magistrate Judge's recommendation that their claims based on organizational standing ... be dismissed." JA385 (not distinguishing between Plaintiffs' organizational claims under Section 1983, the ADA, RA, or IDEA).

civil action." (citation omitted)). Given that Defendants did not argue for dismissal of Plaintiffs' organizational claims for lack of statutory standing, JA164, the magistrate judge's insistence that the "Amended Complaint d[id] not change the court's analysis," JA247, and that *neither* party treated the 3rd R&R as recommending dismissal of Plaintiffs' organizational claims under the ADA, RA, and IDEA, *see generally* JA319 ("The Court should therefore adopt the R&R and dismiss Plaintiffs' *Section 1983 claims* for failure to state a claim" (emphasis added)), JA338 ("the amended complaint contains no allegations that DJJ had notice ... that Child 1 or Child 3 [Justice 360 clients] had undiagnosed or unrecognized disabilities"), the district court was wrong to conclude that the 3rd R&R recommended dismissal of Plaintiffs' organizational claims under the ADA, RA, and IDEA.

**Second**, if the 3rd R&R was at all ambiguous, Plaintiffs' objections and responses reasonably alerted the district court that they objected to the dismissal of *any* of their claims under the ADA, RA, or IDEA. The threshold for triggering *de novo* review is not a high bar. "To trigger *de novo* [rather than clear error] review, an objecting party 'must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" *Elijah v. Dunbar*, 66 F.4th 454, 460 (4th Cir. 2023) (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)). "Importantly, objections need not be novel to be sufficiently

specific." *Id.* (noting that in *Martin v. Duffy*, 858 F.3d 239, 245-46 (4th Cir. 2017)), the Fourth Circuit held that an objection merely restating all of the claims "was sufficiently specific"). "If the grounds for objection are clear, district court judges must consider them *de novo*." *Id.*

Plaintiffs' objections to the 3rd R&R specifically address their ADA, RA, and IDEA claims. JA299-311. Plaintiffs' laboriously explain how the FAC plausibly identifies qualifying individuals with disabilities, establishes causation for their ADA and RA claims, and adequately states systemic violations of the IDEA's FAPE and child-find duties. JA299-311. In so doing, Plaintiffs draw no distinction between their request for direct, organizational relief and DRSC's representational claims on behalf of harmed constituents. *See* JA302 (describing the qualifying disabilities of both child-constituents of DRSC and clients of Justice 360), JA306 (same, for harms), JA309 (same, for child-find duty). By contrast, Plaintiffs refer only to DRSC when discussing their associational claims. *Compare* JA299 ("*Plaintiffs* state plausible claims for relief under the ADA, Rehabilitation Act, and IDEA."), *with* JA345-356 (discussing *DRSC*'s associational standing).

Plaintiffs' objections thus leave no room for a finding of waiver.

C. <u>The district court clearly erred.</u>

Finally, even *had* the magistrate judge recommended dismissal and Plaintiffs failed to object, the district court clearly erred. It is well

settled that so long as Plaintiffs can satisfy Article III arising from violations (which the district court properly held they did, JA388-389), they can raise claims under the ADA, RA, and IDEA. *See, e.g.*, *A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 362-64 (4th Cir. 2008) (following the "unanimous view of our sister circuits" and holding that methadone clinic can bring ADA and RA claims); *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014) (collecting cases); *Fam. & Children's Ctr.*, 13 F.3d at 1061. Thus, in dismissing these claims, the district court created and then embraced a clearly erroneous ruling.

## CONCLUSION

Based on the foregoing, the Court should reverse and order that Defendants' motion be denied.

Dated: March 4, 2025

Respectfully Submitted,

*Signatures on the following page.*

Allen Chaney
ACLU of South Carolina
P.O. Box 1668
Columbia, SC 29202
(864) 372-6681
achaney@aclusc.org

Janette Louard
Anthony Ashton
Quiana-Joy Ochiagha
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215
qochiagha@naacpnet.org

Jeremy Creelan
Jacob D. Alderdice
Todd Costa
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
jalderdice@jenner.com
jcreelan@jenner.com
tcosta@jenner.com

William R. Weaver
Mary E. Marshall
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington DC 20001
wweaver@jenner.com
mmarshall@jenner.com

Amit Patel
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
apatel@jenner.com

Rita Bolt Barker
WYCHE, PA
200 E. Broad Street
Suite 400
Greenville, SC 29601
rbarker@wyche.com

*Counsel for Plaintiffs-Appellants*